# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE R. LONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case number 1:05cv0060 ERW** |
| | ) | **TCM** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying

Jacqueline R. Long disability insurance benefits ("DIB") under Title II of the Social Security

Act ("the Act"), 42 U.S.C. §§ 401-433.  Plaintiff has filed a brief in support of her complaint;

the Commissioner has filed a brief in support of her answer.  The case was referred to the

undersigned United States Magistrate Judge for a review and recommended disposition

pursuant to 28 U.S.C. § 636(b).

## Procedural History

Jacqueline Long ("Plaintiff") applied for DIB in July 2003, alleging she had been

disabled since June 19, 2003, as a result of disc disease in her lower back and neck.  (R. at

52-54.)[1]  Her application was denied initially and after a hearing held in September 2004

---

[1]References to "R." are to the administrative record filed by the Commissioner with her
answer.

before Administrative Law Judge ("ALJ") Earl J. Waits. (Id. at 11-20, 25-28, 217-37.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 5-7.)

## Testimony Before the ALJ

Plaintiff, represented by a lay person, and Jeffrey F. Magrowski, Ph.D., testified at the administrative hearing. Plaintiff's husband, David E. Long, was also present and testified.

Plaintiff testified that she was born on March 9, 1965, and had completed the eighth grade. (Id. at 220.) She had had no other schooling or training, but she could read and write. (Id.)

Plaintiff last worked in June 2003. (Id. at 221.) She quit work because of low back pain. (Id. at 224.) She had worked at a pharmacy for five years prior to stopping work, in home health care before the pharmacy, and at a hat factory before that. (Id. at 221, 223.) She had worked in various positions at the factory, including as a machine operator for three years, a supervisor for three years, and in quality control for one. (Id. at 221-22.) When doing home health care, she helped elderly patients by cleaning their houses, doing their laundry, and making their breakfasts. (Id. at 223.) She did home health care for a very brief period, perhaps three months. (Id.)

Plaintiff had had a cervical fusion in October 2003; a metal plate and four screws were put in her spine. (Id. at 224.) She had tried epidurals before deciding to undergo the surgery. (Id. at 224.) She still had lower back pain and did not feel she could return to work.

(Id. at 225.)  This pain had altered her daily activities; for example, she could not take care of her household like she used to and needed help from her husband, son, and sister.  (Id.)  She cooks quick meals and is unable to cook like she used to do.  (Id. at 226.)

Typically, Plaintiff hurts a little for approximately an hour after getting up in the morning.  (Id.)  After that, she hurts constantly and has to sit down and rest.  (Id.)  She drives to church or the store a couple of times a week.  (Id.)  She is no longer able to go to Sunday school, but tries to attend the worship service.  (Id.)  Her husband is the pastor.  (Id.)  She can no longer engage in her hobbies of reading and working outside.  (Id. at 227.)  She can no longer pick up her nieces and nephews.  (Id.)  It takes longer than it used to for her to get dressed.  (Id.)  Friends have to come see her.  (Id. at 228.)

Plaintiff additionally testified that she could probably walk for 30 minutes and could perhaps pick up a gallon of milk but not carry it.  (Id.)  Lower back pain makes her move when she sits or stands.  (Id. at 228-29.)  She takes pain medication, but it does not alleviate the pain entirely.  (Id. at 226.)  She should take stronger medication; however, she is allergic to "a bunch of things."  (Id.)

At the conclusion of Plaintiff's testimony, her representative offered to call her husband to testify.  (Id. at 229.)  The ALJ said he was welcome to testify if his testimony was not cumulative.  (Id. at 230.)

Mr. Long testified that he and Plaintiff had been married for 21 years.  (Id.)  He worked as a commercial tire salesman.  (Id.)  After undergoing the medical procedures, his wife underwent a dramatic change.  (Id. at 231.)  Where she used to be hard working and

would be working around the house after coming home from her job, she now laid on the couch. (Id. at 231.) She cried sometimes from the hurt and winced from pain when getting up. (Id.) Her symptoms reappeared within months of her surgery. (Id.)

Mr. Long further testified that his wife's doctor had wanted her to stop working after her first surgery, but she insisted on going back to work. (Id. at 232.) Her back problems became worse, however, so they then decided she should stop working. (Id.) She had to have another surgery. (Id.) She had pain in her legs and would lose control of her bladder. (Id. at 233.)

Dr. Magrowski testified as a vocational expert ("VE"). (Id. at 233-36.) He described Plaintiff's past work as a pharmacy technician and clerk, a quality control person, and a sewing machine operator as light, semiskilled work. (Id.) Her work as a supervisor was light and skilled. (Id.) Her job as a home health care worker was medium and unskilled. (Id. at 234.) He was then asked to assume the following hypothetical person:

> [A]n individual who's in the age range of 35 to 40 years of age and has a limited education, having competed [sic] the 8th grade, had the same work history as you've described for the claimant. With that background, the hypothetical #1, I want you to consider would be a person with that background and would be limited to lifting and carrying a maximum of 10 pounds occasionally, less than 10 pounds frequently. This person in terms of sitting, standing and walking would be required to have an option to sit or stand as needed throughout the day and would be precluded from prolonged sitting or standing. In terms of pushing, pulling and reaching, there should be no more than minimal overhead reaching and crawling, bending, stooping, kneeling and crouching and twisting would be not more than occasional. There would be no other exertional limitations. The non-exertional limitations would be that this person would be limited to basically simple, unskilled work, primarily because of impaired concentration due to pain. I assume could not do any of the past work which was all light or medium.

(Id. at 234.)  The VE replied that this hypothetical person could not perform Plaintiff's past work, but could work perform some unskilled sedentary[2] jobs, e.g., an order clerk, call-out operator, or inspector.  (Id. at 234-35.)  There were in excess of 6,000 of the first job in the state economy and 47,000 in the national economy; there were in excess of 1,000 call-out operator jobs in the state economy and 10,000 in the national economy; and there were in excess of 5,000 of the inspector jobs in the state economy and 10,000 in the national.  (Id. at 235.)  Each job was sedentary and unskilled and did not require prolonged sitting.  (Id.)

Plaintiff's representative asked the VE if work would be prevented if the hypothetical person had pain sufficient to make her miss work two or three times each month.  (Id. at 236.)  The answer was, "Yes[.]"  (Id.)  Work would also be prevented if the hypothetical person required two or three rest periods during the workday.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to that application, and records from various health care providers.

When applying for DIB, Plaintiff reported that a deteriorating disc in her lower back and a bulging disc in her neck first bothered her in July 2000 and prevented her from working on June 19, 2003.  (Id. at 70.)  She could not carry anything.  (Id.)  It hurt when she

---

[2]Sedentary work requires lifting no more than ten pounds at a time and occasional walking and standing.  20 C.F.R. § 404.1567(a).

sat for longer than 30 to 45 minutes and when she stood or walked for awhile. (Id.) Her medications included Ambien for sleep, Hydrocodone for pain, SOMA[3] for muscle tightness, and Prozac for depression. (Id. at 76.) The first three were prescribed by Allan Gocio, M.D., and the last by Ramiro Icaza. (Id.) She was five feet three inches tall and weighed 170 pounds. (Id. at 70.)

On a separate form, she reported that of thirteen listed activities, including car maintenance, home repairs, and laundry, she engaged in only four – laundry, vacuuming, banking, and going to the post office – and that was only when pain permitted. (Id. at 81.) If she prepared a meal, it was microwaving a frozen pizza. (Id. at 82.) Her husband did most of the cooking. (Id.) Her personal grooming had changed since her pain started, but she did not explain how. (Id.) Asked what takes most of her time during the day, she replied, "Hurting." (Id.) She drove only when necessary and did not take any unfamiliar routes. (Id. at 83.) She had difficulty following instructions, verbal or written, because she found it difficult to concentrate. (Id.)

Three months after applying, a reconsideration disability report was completed in Plaintiff's behalf. (Id. at 95-98.) Plaintiff had a lot of lower back pain that radiated into her hips and down her legs. (Id. at 95.) Since applying for DIB, Plaintiff had a steroid epidural at Southeast Missouri Hospital. (Id. at 96.) She could sit for only 30 minutes before she had to get up. (Id. at 97.)

---

[3]SOMA is a muscle relaxant. Physicians' Desk Reference, 3252 (55th ed. 2001).

Plaintiff had earnings from 1985 through 1987, inclusive, and from 1989 to 2003. (Id. at 55-59.) Her annual wages generally increased. (Id.) In her last full year of employment, 2002, she earned $18,945.00. (Id. at 59.)

The relevant medical records[4] before the ALJ begin in 2000.

On September 29, Plaintiff consulted Dr. Gocio, a neurosurgeon, for her complaints of neck, shoulder, and arm pain. (Id. at 170-72.) She was described as not having any significant neurologic deficits, but as being in severe distress "[d]ue to neck, shoulder, and arm pain." (Id. at 170-71.) His impression was of "cervical disc herniation with nerve root compression." (Id. at 170, 172.) He opined that Plaintiff would probably require surgery. (Id.) She was to think about it and inform him of her decision. (Id.) She was also to do light duty at work. (Id.)

Plaintiff elected the surgery, and on October 12, underwent an "[a]nterior cervical decompression and fusion of C5-6 with cornerstone graft and Atlantis plate." (Id. at 117-19.) At a follow-up visit on November 10, Dr. Gocio described Plaintiff as "doing very well with minimal pain in the neck and shoulder area." (Id. at 116, 169.) He noted that "[h]er arm pain [has] resolved significantly." (Id.) He also noted that Plaintiff was back at work and doing okay. (Id.) She had no restrictions, was given some neck exercises, and was to return in two months. (Id.)

_____

[4]Medical records relating to such conditions as acne, contact dermatitis, and fluid retention are not discussed but may be found in the record at pages 145 to 150, inclusive.

Plaintiff did return, on January 12, 2001, and her x-rays revealed the graft was healing well and the plates and screws were in good positions.  (Id. at 168.)  She continued to have neck and shoulder pain.  (Id.)  Straightening of her cervical spine was indicative of a muscle spasm.  (Id.)  She had been unable to do the neck exercises, but was going to start.  (Id.)  She was reportedly doing okay at work, although extended hours were causing her neck pain to increase.  (Id.)  She was considering reducing her work load, but was not yet ready to do so.  (Id.)  At a follow-up visit two months later, Plaintiff continued to have some left shoulder and upper arm pain.  (Id. at 167.)  It was, however, better than it had been the week before.  (Id.)  Work was going well.  (Id.)  X-rays revealed the graft was healing well.  (Id.)  Dr. Gocio decided to start her on SOMA.  (Id.)

At the next, April 10, visit, the SOMA was reportedly "very helpful."  (Id. at 166.)  Plaintiff was having minimal pain, and was to continue on her current activity level and return when necessary.  (Id.)  Two weeks later, however, Plaintiff consulted another doctor in Dr. Gocio's practice, Kee B. Park, M.D., after waking up with severe neck pain.  (Id. at 165.)  X-rays failed to reveal any problem.  (Id.)  She was treated with SOMA, Darvocet, and neck stretching exercises and was expected to improve within four days.  (Id.)  If not, she was to be referred to physical therapy.  (Id.)

On May 25, she returned to Dr. Gocio with residual shoulder pain.  (Id. at 164.)  He increased her medication and recommended trigger point injections.  (Id.)  Dr. Ramiro Icaza had performed these injections in the past, and Dr. Gocio recommended she return to him if he was willing to do so again.  (Id.)

On September 14, Plaintiff reported to Dr. Gocio that she had had "some trigger point injections" with mixed results. (Id. at 163.) The first had worked "very well"; the second had not worked "as well." (Id.) She continued to take the Darvocet and SOMA, but was not doing any "significant physical therapy or exercises." (Id.) She was to continue on the medication and use a soft collar as needed. (Id.)

On December 6, Dr. Gocio referred Plaintiff to the Pain Clinic at Saint Francis Hospital for trigger point injections to alleviate her left shoulder pain. (Id. at 114-15.) It was noted that she was allergic to codeine, morphine, and Demerol. (Id.) Her past surgical history included a hysterectomy and cholecystectomy. (Id.) The physician, Terry L. Cleaver, M.D., opined that she had myofascial pain. (Id.) When Plaintiff next saw Dr. Gocio, on December 14, she informed him that the injections had been "very helpful." (Id. at 162.)

On June 25, 2002, Plaintiff returned to Dr. Gocio with complaints of persistent neck and left arm pain. (Id. at 113, 161.) Dr. Gocio decided to have Plaintiff undergo diagnostic tests to investigate the cause of this pain. (Id.) Consequently, on July 11, Plaintiff underwent a cervical myelogram and computerized tomography ("CT") scan of her cervical spine. (Id. at 109-12.) The myelogram revealed "[m]ild attenuation of the left L5-6 nerve root sleeve" and "mild ventral extradural filling defect at C6-7." (Id. at 110.) The CT scan revealed (i) "a mild, right, central paracentral disc protrusion at C4-5"; (ii) a "[m]ild central disc protrusion with associated posterior spurring on C5-6"; and (iii) "[m]ild to moderate central disc protrusion which flattens the ventral theca sac, abutting the cord at C6-7." (Id.

at 111-12.)  On July 24, Plaintiff returned to Dr. Gocio.  (Id. at 160.)  He concluded that it was best to repeat the conservative course of treatment to see if her condition would improve.  (Id.)

On July 30, Plaintiff began sessions at Jackson Physical Therapy & Rehab., Inc.  (Id. at 104-05.)  She reported neck pain beginning in November 2000, the month after she had had disc surgery.  (Id. at 104.)  The pain was constant, dull, worse at the end of the day, and aggravated by stress.  (Id.)  On a scale of one to ten, with ten being the most severe, her pain was a four at best and eight at worst.  (Id. at 104A.)  She had a limited range of motion when bending or rotating to the left or right.  (Id.)  She was to receive treatment three times a week for three weeks.  (Id. at 105.)  On August 1, Plaintiff was treated with a hot pack, ultrasound and electrical stimulation, and massage.  (Id. at 103.)  Her pain was a four.  (Id.)  At her next session, the next day, Plaintiff reported that she had felt better in the morning; however, after working all day, the pain was again bad.  (Id. at 102.)  After another 45-minute treatment, Plaintiff was given home exercises and was educated on the relationship between her posture and symptoms.  (Id.)  She did not return for another session, and was discharged from physical therapy.  (Id.)

She reported to Dr. Gocio on September 3 that she had minimal benefits from physical therapy and was unable to continue.  (Id. at 159.)  She had been getting some relief from home heat and massage treatments, and was taking the SOMA only at night to help alleviate the muscle spasm.  (Id.)  She had had a "few good days with minimal pain but still [had] some chronic nagging pain in the left neck and shoulder area."  (Id.)  Dr. Gocio opined

that her overall condition had improved without further surgery. (Id.) Even with surgery, however, she would have some increased restriction in her mobility and the possibility of a return of her pain. (Id.) He asked her to increase the neck exercises and do light resistive exercises. (Id.)

Plaintiff next saw Dr. Gocio on November 20. (Id. at 158.) She reported continuing significant pain at the C6 level and in her left upper extremity. (Id.) She did not want to pursue an evaluation by myelography and possible surgery, but did want to continue trigger point injections. (Id.) She was having difficulty getting into the pain program at St. Francis Medical Center, so Dr. Gocio elected to do the injections himself. (Id.)

Two days later, he administered a trigger-point injection of steroid medication into Plaintiff's left shoulder at the spot identified by her as where her pain was the greatest. (Id. at 107.)

In addition to consulting Dr. Gocio, Plaintiff began on May 25, 2001, to consult Deanna Siemer, M.D., for her general health. (Id. at 195.) One year after her initial appointment, she called Dr. Siemer for a referral for a second opinion about shoulder surgery. (Id.) She was referred to a Dr. Yingling.[5] (Id.) In December, Plaintiff consulted Dr. Siemer about back pain and expressed concern about having kidney stones. (Id.) On January 3, 2003, Plaintiff underwent an intravenous pyelogram ("IVP") to determine whether

---

[5]There is no indication in the record that Plaintiff consulted Dr. Yingling.

kidney stones were the cause of her flank and back pain.  (<u>Id.</u> at 129-30.)  They were not.

(<u>Id.</u> at 130.)

A few weeks later, on January 29, Plaintiff had a magnetic resonance imaging

("MRI") of her lumbar spine.  (<u>Id.</u> at 137-39.)  She reported a history of low back pain of

one-month duration.  (<u>Id.</u> at 139.)  The MRI revealed a degenerative disc signal loss at L5-S1

without significant loss in disc height and soft disc protrusions at T11-T12 and L5-S1.  (<u>Id.</u>)

Dr. Siemer diagnosed low back pain and prescribed a Medrol dose pack.  (<u>Id.</u> at 195.)  On

February 3, Plaintiff went to the Pain Clinic at Southeast Missouri Hospital on referral by

Dr. Siemer for her complaints of low back pain.  (<u>Id.</u> at 125-27.)  She was treated with a

lumbar epidural steroid injection and given a prescription for Vioxx, to be taken once a day.

(<u>Id.</u> at 126-27.)  The treatment was ineffective; consequently, she returned to the Pain Clinic

on March 12.  (<u>Id.</u> at 124.)  She was again treated with a lumbar epidural steroid injection

and given a prescription for Vioxx.  (<u>Id.</u> at 123-24.)

On March 25, Plaintiff returned to Dr. Siemer with complaints of tenderness in her

rotator cuff, palpitations, and anxiety.  (<u>Id.</u> at 193.)  Her dosage of Prozac[6] was increased,

and she was scheduled for an MRI of her left shoulder.  (<u>Id.</u>)

On June 5, Plaintiff consulted Edward Doyle, M.D.,[7] about shoulder pain radiating

to her left arm.  (<u>Id.</u> at 142.)  On examination, she had discomfort with flexion and extension

---

[6]This is the first reference in the medical records to Prozac being prescribed at all.

[7]Plaintiff had previously consulted Dr. Doyle about matters irrelevant to the pending case.
<u>See</u> note 3, supra.

and pain in her right arm.  (Id.)  She was to be scheduled for an MRI and re-referred to Dr. Gocio, who was then in St. Louis.  (Id.)  Five days later, Plaintiff underwent an MRI of her cervical spine.  (Id. at 134-36A.)  She was described as being symptomatic for approximately two and one-half years.  (Id. at 135.)  The impression following the MRI was of "small soft disc bulges at C4-C5 and C6-C7, with associated intrusion on the anterior dural sac."  (Id.)  "There [was] no neural canal involvement."  (Id.)  On June 16, Dr. Doyle prescribed Vicodin for Plaintiff.  (Id. at 141.)

Four days later, Plaintiff returned to Dr. Gocio, who was at the Neuro Science Institute of Forest Park Hospital in St. Louis.  (Id. at 155-57.)  She reported that the lumbar epidural steroid injections had helped for several months; physical therapy had not helped.  (Id. at 155.)  On examination, she had bilateral spasms and a decreased range of motion.  (Id.)  He concluded that she was unable to work, and the date when she could return to work was unknown.  (Id. at 155-56.)  Seven days later, she had a cervical and lumbar myelogram.  (Id. at 152-54.)  In addition to the cervical fusion at C5 and C6, at L5-S1 there was a mild right neural foraminal stenosis and a right paracentral and right lateral recess disc extrusion.  (Id. at 154.)

On October 17, a CT scan post-myelogram of Plaintiff's lumbar spine revealed "[l]ateral disc herniation on the right at L5-S1 with chronic spurring and discogenic bulge and/or chronic herniation in a right paramedian distribution.  This results in deformity and compression of the right S1 nerve root in its lateral recess."  (Id. at 188-89.)  A diskogram performed that same day showed the source of Plaintiff's pain to be at L5-S1.  (Id. at 190,

201.)  Consequently, on October 29, Dr. Gocio performed a lumbar diskectomy and fusion at L5-S1, including placing metallic spacer material into Plaintiff's disc space at L5-S1.  (Id. at 199-206.)  His diagnosis prior to surgery was disc bulging at L-L4, L4-L5, L5-S1; degenerative disk disease at L4-L5 and L5-S1; and lumbar radiculopathy.  (Id. at 202.)  Plaintiff's post-operative course was uneventful, and she was discharged on November 1.  (Id. at 200.)  Plaintiff saw Dr. Siemer in November for removal of the staples used in the back surgery.  (Id. at 193.)

On March 15, 2004, Plaintiff was released from Dr. Gocio's care to return as needed.  (Id. at 208.)  She had not been released to return to work.  (Id.)  He opined that it was unlikely that Plaintiff could "be suitable for gainful employment unless she could either participate in a work reconditioning program and increase her functional level . . . or secure adequate vocational rehabilitation to allow her to function in a sedentary activity" with the following restrictions:  "no lifting greater than 15 pounds and significant limitations on activity such as prolonged standing, prolonged sitting, stooping, bending, twisting, climbing, overhead reaching, etc."  (Id.)

In addition to Plaintiff's medical records, the ALJ had before him a Psychiatric Review Technique Form ("PRTF") completed in August 2003 by James Spence, Ph.D., and (Id. at 173-86, 213-14.)

Dr. Spence concluded there was insufficient evidence of any mental impairment, noting that Plaintiff had reported being treated for depression but two requests to her representative for additional information had been unanswered.  (Id. at 173, 186.)

## The ALJ's Decision

The ALJ first noted that the hearing was held via videoconferencing. (Id. at 13.) The witnesses were in Missouri; he was in California. (Id. at 13, 219.) He then noted that Plaintiff was insured for DIB through December 31, 2008. (Id. at 14.)

After reciting the factors to be considered when evaluating a claimant's credibility, see page 20 below, and also noting Plaintiff's allegations about why she could not work and her testimony that she could drive to church and to the store and do limited meal preparation and housework, the ALJ concluded that the record established that she had severe, medically determinable musculoskeletal impairments, i.e., degenerative disc disease in her lumbosacral spine, with status-post lumbar fusion at L5-S1, and degenerative disc disease in her cervical spine, status-post cervical fusion at C5-6, but did not have a severe, medically determinable mental impairment, the record reflecting only one prescription for an anti-depressant and no other sign of significant depression or other mental impairment. (Id. at 15.)

The ALJ next addressed the medical records of Plaintiff's degenerative disc disease. (Id. at 16.) He found that the evidence indicated that surgeries had helped her back and neck condition, noting that Dr. Gocio recommended only conservative care, including a soft collar, despite her complaints of pain; that there was no objective medical support for disabling levels of pain; that there was no evidence of any talk of further surgery; and that Dr. Gocio had released her in March 2004 to return to work with certain restrictions. (Id.) This latter factor was important because the opinion of the treating physician was "normally entitled to significant weight." (Id.) Moreover, that opinion was consistent with "the upbeat

tone of his post-surgical treatment notes" and with Plaintiff's "admitted activities of daily living."  (Id.)

Addressing the question of Plaintiff's residual functional capacity ("RFC"), the ALJ concluded that Plaintiff was limited to sedentary work activities, but had the RFC to lift or carry up to ten pounds occasionally and less than ten pounds frequently; to stand or walk, with normal breaks for at least two hours in an eight-hour day; and to sit for six hours in an eight-hour day.  (Id. at 16-17.)  She could not do prolonged sitting or standing and must have a sit/stand option.  (Id. at 17.)  Additionally, she could not perform more than occasional stooping, bending, kneeling, crouching, twisting, and climbing and could not do more than minimal overhead reaching.  (Id.)  She was limited to the performance of simple, unskilled work.  (Id.)

This RFC precluded Plaintiff's return to her past relevant work.  (Id.)  Shifting the burden to the Commissioner, see page 21, below, the ALJ found that the testimony of the VE about the jobs available in the national and state economies satisfied this burden.  (Id.)  The ALJ further found, for the reasons earlier set forth, that Plaintiff's allegations about her limitations were not credible.  (Id. at 18.)

Accordingly, Plaintiff was not disabled within the meaning of the Act. (Id. at 19.)

### Additional Records Before the Appeals Council

The Appeals Council had before it the report of an MRI in July 2004 and a letter by Dr. Gocio to Plaintiff's representative in August 2004 about her current condition.  (Id. at 8, 210-14.)

On July 15, at Dr. Siemer's request, Plaintiff had an MRI of her S1 joints and of her lumbar spine.  (Id. at 210-12.)  The MRIs showed degenerative changes in her S1 joints, central disc herniation at T11-12, diffuse degenerative changes, and a small central disc protrusion at L5-S1.  (Id.)

Dr. Gocio reported that Plaintiff had "had progressive and worsening low back and lower extremity symptomatology as well as persistent left arm symptomatology, which necessitated further evaluation with myelography."  (Id. at 213.)  If her condition worsened and if she developed progression of spinal cord findings, she might require thoracic fusion surgery.  (Id.)  If she returned to work, he opined, her condition was likely to deteriorate further and require surgery.  (Id.)  The plan was to continue pain management and to restrict "employment of any type" in order to prevent further deterioration of her spinal condition.  (Id.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B) (alterations added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step in the process, the ALJ "review[s] [claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past."

20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of

medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing <u>Polaski v.</u>

<u>Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an

ALJ may not disregard subjective complaints of pain based only on a lack of objective

medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual

determination that a Claimant's subjective pain complaints are not credible in light of

objective medical evidence to the contrary."  **Id.**  <u>See</u> <u>also</u> **McKinney v. Apfel**, 228 F.3d

860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical

evidence regarding a claimant's disability is inconsistent.").  After considering the <u>Polaski</u>

factors, the ALJ must make express credibility determinations and set forth the

inconsistencies in the record which caused the ALJ to reject the claimant's complaints.

**Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059

(8th Cir. 1998).

The burden at step four remains with the claimant.  <u>See</u> **Banks v. Massanari**, 258

F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not

the Social Security Commissioner's burden, to prove the claimant's RFC."  **Pearsall**, 274

F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past

relevant work, the burden shifts at step five to the Commissioner to establish that the

claimant maintains the RFC to perform a significant number of jobs within the national

economy.  **Banks**, 258 F.3d at 824.  <u>See</u> <u>also</u> 20 C.F.R. § 404.1520(f).  The Commissioner

may meet her burden by eliciting testimony by a VE.  **Pearsall**, 274 F.3d at 1219.  If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole."  **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision."  **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision.  **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998).  The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently."  **Strongson**, 361 F.3d at 1070.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ erroneously (a) failed to give the proper weight to Dr. Gocio's opinion and (b) assessed her credibility.[8]  The analysis of both is interrelated and follows.

After reciting the factors in Polaski, the ALJ discounted Plaintiff's description of her limitations, a description that was, according to the VE's testimony, inconsistent with an "'ability to perform the requisite acts [of a job] day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Reed v. Barnhart**, 399 F.3d 917, 923 (8th Cir. 2005) (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)) (alteration added).  The ALJ cited two reasons for his decision:  (1) the inconsistency between that description and Dr. Gocio's records and (2) her ability to drive to church and to the store and do limited meal preparation and housework.

"In discrediting subjective claims, the ALJ cannot simply invoke Polaski or discredit the claims because they are not fully supported by medical evidence." **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006) (citing Lowe, 226 F.3d at 972).   Accord **Brosnahan v. Barnhart**, 336 F.3d 671, 677-78 (8th Cir. 2003).  "Instead, the ALJ must make an express credibility determination that explains, based on the record as a whole, why the claims were found not to be credible." **Dukes**, 436 F.3d at 928 (citing Lowe, 226 F.3d at 971-72).

---

[8]Plaintiff also argues that the ALJ erred by not considering Dr. Gocio's August 2004 letter. This evidence was clearly not considered by the ALJ, but was before the Appeals Council and marked as an Appeals Council exhibit.  A letter from Plaintiff's lay representative indicates it was submitted a few weeks prior to the administrative hearing.  Because the undersigned finds a remand proper for other reasons, the question of when the exhibit was submitted will not be reached.

In support of his adverse credibility decision, the ALJ cited Dr. Gocio's recommendation of conservative care, lack of objective support for complaints of pain, lack of any discussion regarding further surgery, and a release to return to work with certain restrictions. The ALJ also characterized the tone of Dr. Gocio's post-surgical treatment notes as being "upbeat."

As noted above, the ALJ's decision must be supported by substantial evidence on the record as a whole. An ALJ may not cherry-pick those portions of the record that support his or her decision and ignore the rest. Dr. Gocio did, at various times, recommend conservative treatment, e.g., neck exercises and the use of a soft collar. When Plaintiff's complaints of pain persisted, however, Dr. Gocio recommended such treatment as trigger point injections and consistently prescribed a muscle relaxant. Moreover, the absence of talk of further surgery was followed by a second fusion surgery after Plaintiff continued to complain of pain and a diskogram revealed the source of Plaintiff's pain and the authorization to return to work was preceded by and followed by a recommendation that she not return, the last recommendation being accompanied by a warning that a return to work could lead to further deterioration. Although the ALJ may not have had this last recommendation before him, it was dated before the administrative hearing and supports Plaintiff's subjective complaints rather than weakens them.

Also supporting her subjective complaints were her consistent search for relief, e.g., consulting Dr. Doyle, undergoing surgery, having trigger point injections, and taking medication, see **Beckley**, 152 F.3d at 1060; her strong work record, see **Curran-Kirksey v.**

**Barnhart**, 315 F.3d 964, 968 (8th Cir. 2003); and her daily activities. The ALJ, however, found Plaintiff's daily activities to be the second of two factors detracting from her credibility. This was error.

When applying for DIB and when testifying, Plaintiff described limited daily activities. She drove to church or to the store a few times a week, but only when necessary and did not take unfamiliar routes. She did limited household chores – she did laundry and vacuumed only when her pain permitted and prepared only quick meals. She did not do dishes, make the beds, iron, garden, mow the lawn, or take out the trash. She did not go to visit friends; they had to come to her.

"In numerous cases [the Eighth Circuit Court of Appeals has] noted that 'the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.'" **Swope v. Barnhart**, 436 F.3d 1023, 1026 n.4 (8th Cir. 2006) (quoting Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995)) (alteration added). See also **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir. 1996) (holding that a claimant need not be reduced to life in front of the television in order to prove that pain precludes all productive activity). Consequently, a court "must guard against giving undue evidentiary weight to a claimant's ability to carry out the activities incident to day-to-day living when evaluating the claimant's ability to perform full-time work." **Reed**, 399 F.3d at 923.

In the instant case, Plaintiff's subjective complaints were consistent with the record, sporadically lacking support only in some of Dr. Gocio's medical records. See **Swope**, 436 F.3d at 1024, 1026 n.4 (noting that claimant's daily activities, "including doing dishes, shopping, carrying groceries into the house, driving a car, mowing the lawn, and fishing," were not "a significant reason" for discrediting his complaints of disabling pain); **Reed**, 399 F.3d at 922-23 (finding that ALJ erred in his adverse credibility decision regarding claimant who could fix meals, watch movies, check the mail, do laundry but not carry the laundry basket, and go grocery shopping only when absolutely necessary and when accompanied); **Burress v. Apfel**, 141 F.3d 875, 881 (8th Cir. 1998) (finding that ability to walk one mile on treadmill and daily activities of washing dishes, cooking, dusting, sweeping, making beds, vacuuming one room at a time, doing laundry, visiting, reading, watching television, driving "moderate distances," and caring for pets, activities which claimant testified she could only do occasionally, were not inconsistent with claimant's subjective complaints). Cf. **Tindell v. Barnhart**, 444 F.3d 1002, 1006 (8th Cir. 2006) (affirming ALJ's decision discounting claimant's subjective complaints based, in part, on her daily activities of attending college classes, working ten hours per week in a catering business, and taking care of a young grandson); **Pelkey v. Barnhart**, 433 F.3d 575, 578 (8th Cir. 2006) (finding no error in ALJ's adverse credibility decision based, in part, on claimant's daily activities of performing household chores, mowing the lawn, raking leaves, shopping for groceries, and driving a car); **Gregg v. Barnhart**, 354 F.3d 710, 713 (8th Cir. 2003) (affirming ALJ's credibility decision

regarding claimant whose daily activities included tending livestock, e.g., moving hay bales and feed, for one-half to two hours per day).

Additionally, Plaintiff's subjective complaints were corroborated by her husband, whose testimony was not mentioned at all by the ALJ.  See **Cox v. Barnhart**, 345 F.3d 606, 610-11 (8th Cir. 2003) (concluding that ALJ improperly discredited corroborating testimony of claimant's spouse and neighbor and noting that this testimony and that of claimant was consistent with medical record); **Holmstrom v. Massanari**, 270 F.3d 715, 722 (8th Cir. 2001) (holding to same effect).

## Conclusion

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts, but such assessments must be based on substantial evidence." **Masterson v. Barnhart**, 363 F.3d 731, 738 (8th Cir. 2004). For the foregoing reasons, substantial evidence to support the ALJ's decision on Plaintiff's credibility is lacking. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation, including a reevaluation of the credibility of Plaintiff and her husband.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  10th  day of July, 2006.